[Cite as *In re N.R.*, 2025-Ohio-2896.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: N.R. | : |
| | :   C.A. Nos. 30348; 30354 |
| | : |
| | :   Trial Court Case No. C-2021-004643-01,0M |
| | : |
| | :   (Appeal from Common Pleas Court-Juvenile Division) |
| | : |
| | :   **FINAL JUDGMENT ENTRY & OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 15, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,



_____
ROBERT G. HANSEMAN, JUDGE


TUCKER, J., and HUFFMAN, J., concur.

**OPINION**
MONTGOMERY C.A. Nos. 30348; 30354

TRISTAN D. DIEGEL, Attorney for Appellant, Montgomery County Children Services
JENNIFER E. MARIETTA, Attorney for Appellee, Biological Mother
ALANA VAN GUNDY, Attorney for Appellee, Legal Father

HANSEMAN, J.

{¶ 1} Appellants Montgomery County Children Services ("MCCS" or "the agency") and Mother appeal from a judgment of the Montgomery County Common Pleas Court, Juvenile Division, which granted legal custody of N.R. to Appellee Father and overruled MCCS's motion for permanent custody.

{¶ 2} MCCS challenges the trial court's determination that awarding Father legal custody was in the child's best interest and argues that MCCS should have been granted permanent custody. Mother also challenges the trial court's determination that awarding Father legal custody was in the child's best interest. However, Mother argues that the trial court did not err in denying MCCS's motion for permanent custody but instead should have reunified N.R. with Mother.

{¶ 3} For the following reasons, the judgment of the trial court is affirmed.

## I. Factual and Procedural History

{¶ 4} N.R. was born in April 2015 to Mother and Father. On March 6, 2021, Mother gave birth to N.S., who is not the subject of this appeal. N.S.'s legal father is M.S., who is not involved in this appeal.

{¶ 5} On August 2, 2021, MCCS filed an abuse, neglect, and dependency complaint requesting temporary custody of N.R. A second complaint was filed on October 20, 2021, due to the expiration of the time limits for the initial complaint. The second complaint alleged

that, on March 7, 2021, MCCS received a referral that Mother had tested positive for marijuana at the time of N.S.'s birth. Mother had also tested positive on February 20, 2021, for amphetamines and opiates during her pregnancy.

{¶ 6} The second complaint additionally alleged that, on July 31, 2021, Dayton Police responded to a call and discovered Mother and M.S. unconscious in their vehicle. Both Mother and M.S. had overdosed, and Narcan was used to revive Mother. N.R. and N.S. were in the vehicle at that time. Mother claimed that she did not know what had happened but said that N.R. had put medication into her cup. Emergency custody of N.R. and N.S. was given to MCCS on July 31, 2021. On August 24, 2021, Mother and M.S. admitted to MCCS that they had overdosed again. Interim temporary custody of N.R. was granted to MCCS. N.R. was placed in foster care and remained in his foster home during the pendency of the proceedings.

{¶ 7} On January 7, 2022, N.R. was adjudicated an abused, neglected, and dependent child. Temporary custody was awarded to MCCS. A case plan was created for Mother, but Father's whereabouts were unknown.

{¶ 8} MCCS filed a motion for permanent custody of N.R. on June 6, 2022. A hearing on the motion was scheduled, but MCCS requested and received a continuance, in part because service on Father had not been perfected. In October 2022, Father was located, and he was given a case plan as well as visitation with N.R. On January 4, 2023, MCCS filed a motion for a first and second extension of temporary custody to MCCS, which was granted. MCCS withdrew its motion for permanent custody.

{¶ 9} On July 27, 2023, MCCS filed a motion requesting that legal custody of N.R. be given to Father with protective supervision to MCCS. According to the motion, Mother had not made substantial progress on her case plan objectives and had not demonstrated an

ability to manage her sobriety. Father, however, had successfully addressed his case plan objectives. Father had safe and stable housing and a legal source of income. Father completed the required domestic violence course and provided MCCS with a certificate of completion. Overnight visits between N.R. and Father began in July 2023, and there had been no reported concerns.

{¶ 10} Less than two months later, on September 19, 2023, MCCS reversed course and filed a motion requesting that permanent custody of N.R. be given to the agency. In contrast to the July 27, 2023 motion, this motion alleged that Father had only completed one overnight visit with N.R., had missed the remaining visits with him, had been difficult to work with, and had demonstrated concerning behaviors. One of the concerning behaviors identified was that Father had allowed N.R. to ride on a motorcycle and videotaped it. The motion alleged that Father had not attended any of N.R.'s medical appointments and had visitation and transportation issues. According to MCCS, Father had not demonstrated an ability to meet and understand N.R.'s special and medical needs.

{¶ 11} Father subsequently filed a motion asking for legal custody of N.R. A hearing on the pending custody motions was held on February 23, 2024. At the hearing, MCCS withdrew its motion to grant legal custody to Father and proceeded only on its motion for permanent custody of N.R. The following is a summary of the testimony that was presented at the hearing.

{¶ 12} The caseworker testified that she had been assigned to the family's case in August 2022. She explained that MCCS initially became involved with the family in 2021 when Mother and N.S. tested positive for THC, i.e., marijuana. In July 2021, Mother and M.S. were found overdosed in a car at a gas station. N.R. and N.S. were in the vehicle at the time and were removed from Mother's care. The children were placed in a licensed foster

home together and remained there during the pendency of the case. The children were adjudicated dependent, neglected, and abused. Temporary custody of N.R. was granted to MCCS on January 7, 2022.

{¶ 13} According to the caseworker, N.R. did very well in the foster home, which was safe and appropriate. The placement was not a foster-to-adopt, and the foster parents were not willing to adopt the children. However, if MCCS had been granted permanent custody, the foster parents were willing to maintain the placement of the children until they were adopted by someone else. The caseworker testified that even if permanent custody were granted to MCCS, it was not guaranteed the siblings would stay together for adoption because both children had special needs.

{¶ 14} At the time of the hearing, N.R. was in third grade. He had educational and behavioral IEPs and received speech therapy. He had been referred to a psychiatrist and was on three different medications. N.R. had delays and impairments and needed 24-hour care. N.R. was on the autism spectrum and needed a very strict routine with lots of attention, care, and supervision. Mother had attended N.R.'s medical appointments. Although Father had been advised of N.R.'s medical appointments, he did not attend any of them. The caseworker did not feel that Father had the resources to support N.R.'s special needs. Both Mother and Father attended N.R.'s basketball games.

{¶ 15} According to the caseworker, Mother's case plan objectives were to obtain and maintain stable housing; engage in mental health and substance abuse treatment; follow through with the treatment recommendations of her provider; "comply with agency or treatment"; provide drug screens; remain substance free; visit with the children; maintain a legal source of income; not allow substance abuse to impact her parenting; complete monthly agency home visits; sign releases of information; and complete parenting classes.

{¶ 16} Mother completed the mental health and alcohol and drug assessment and followed the recommendations of the assessment. Mother was required by MCCS to attend groups daily, attend weekly individual sessions with her treatment provider, complete drug screens, and maintain her medically-assisted treatment. Mother was incarcerated during the custody proceedings, during which time she completed parenting classes. Mother supplied the requested releases of information and cooperated with MCCS's home visits. Mother consistently had unsupervised visits with N.R. on a weekly basis and there were no concerns with the visitations. Mother and N.R. were bonded, and she took very good care of him. She was managing his mental health and other needs and attending his doctor's appointments.

{¶ 17} The caseworker's testimony revealed that the agency's ongoing concerns for Mother revolved around her inability to maintain sobriety and obtain stable, independent housing. Mother had struggled with substance abuse during the pendency of the case and had been incarcerated. Mother was engaged in Family Treatment Court and was doing okay but continued to test positive for THC. In July 2023, Mother tested positive for fentanyl. Mother also was not honest about her drug use a few times after testing positive while in Family Treatment Court. Mother did not have any substance-free days. Mother lived with maternal grandmother and slept on the couch. There was no space in the residence for either of her children. Mother had obtained employment in January 2024 at McDonald's but had no source of income prior to that.

{¶ 18} Father became involved in the case in October 2022. Father's case plan objectives were to engage with the agency, complete a domestic violence class, complete an assessment for mental health services, obtain stable employment, and obtain stable housing.

{¶ 19} Father completed domestic violence classes in April 2023. Father had steady

income and safe and stable housing. Father received mental health treatment through his primary care provider and signed a release of information. Father's doctor provided a response demonstrating compliance with the mental health services aspect of Father's case plan.

{¶ 20} On September 23, 2023, the caseworker visited Father's home. The residence had working utilities, ample food, and running water. The caseworker did not inspect the entire home because Father did not have home visitation with N.R. at the time. Father had three dogs in his home, but the caseworker had no concerns about them. The caseworker had no concerns about the residence and found it appropriate.

{¶ 21} Between October 2022 and October 2023, Father was compliant with the case plan, and the agency had no issues with him. However, the caseworker testified to behavioral concerns and transportation issues involving Father that started in October 2023. The caseworker saw a recording that Father had made in which he said he was not happy that the agency did not explore suspected abuse of N.R. At the end of the recording, Father said that he would hurt anybody that was hurting his son. The agency considered the statement inappropriate because N.R. was in foster care and Father should have made a report so the agency could investigate. The caseworker noted that following the recording, Foster Mother expressed some concern about interacting with Father going forward. The caseworker and her manager spoke with Father about the recording, and Father suggested meeting at Springboro Police Department for future visits. The caseworker added a requirement for Father that he communicate with the foster parents a half hour prior to visitation to let them know if he was going to be late or unable to attend.

{¶ 22} The caseworker also shared a concern about a video that Father recorded of himself and N.R. on Father's motorcycle. MCCS believed Father was not permitted to

transport N.R. on a motorcycle while N.R. was in its custody. But the caseworker conceded that if Father had legal custody of N.R., Father would be able to decide whether N.R. could ride on a motorcycle or not.

{¶ 23} The last time the caseworker communicated with Father in person was in October 2023 when she attempted a home visit. Father would not allow the caseworker into his home at that time. After that, they communicated via email and Zoom.

{¶ 24} Father did not visit N.R. from September to November 2023. In September, Father told the caseworker that he would not be able to visit N.R. until he could get reliable transportation because his truck had been totaled by a drunk driver. In December 2023, visits were brought back to the agency, and Father visited N.R. there. The visits were moved to the agency because, in November 2023, a Children Services case was opened in Hamilton County in which Father was an "associated person." The case involved Father's girlfriend and her two children. Father also had a pending felony animal cruelty charge in Hamilton County related to one of his dogs. The details of the alleged charges were unknown, but the caseworker believed they possibly had something to do with Father pistol whipping one of his dogs.

{¶ 25} The caseworker testified that N.R. knew who Father was, but their bond was not as strong as it could have been in her opinion. The caseworker observed three or four visits between Father and N.R. at the agency through cameras. She did not have concerns with Father's visits. When Father did not visit with N.R. between September and November 2023, it adversely impacted N.R., who was very affected by changes in his routine. When N.R. missed visits with Father, as well as Mother, he was known to not want to bathe. He would also wipe his feces on his wall or hide them under his bed. When Father was unable to get transportation for visits, he requested make-up visits, and Foster Mother would oblige.

{¶ 26} The caseworker testified that at the time of the hearing, the ongoing concerns with Father consisted of his behaviors, involvement with Hamilton County Children's Services, and lack of bond with N.R. The caseworker did not believe that N.R. could be reunified with Mother or Father and thought it was in his best interest for the agency to receive permanent custody. According to the caseworker, neither parent was able to meet N.R.'s needs.

{¶ 27} Foster Mother testified on behalf of MCCS. N.R. and N.S. were first placed in her home in August 2021. They both did very well and had made great improvement in their time there. The siblings lived in the home with Foster Mother, Foster Father, and the foster parents' four children. The foster parents were not willing to adopt the siblings but were willing to maintain the current placement until something more permanent became available. N.R. had bonded with the foster family and called Foster Mother "mom," although he was fully aware that Mother was his biological mother. The foster parents treated the siblings like their biological children. They read books every night before bed, sang songs, and went on outings together. N.R. enjoyed swim outings and movie nights with the foster family.

{¶ 28} Foster Mother explained that, at the time of the hearing, N.R. had been recently diagnosed with autism and attention deficit hyperactivity disorder ("ADHD"). He received occupational therapy ("OT"), speech therapy, physical therapy ("PT") for fine motor skills, and self-regulation services, and he saw a therapist at school. N.R. took three different medications for his mood disorder, difficulty sleeping, and ADHD. N.R. typically attended speech therapy every Monday. N.R. saw his pediatrician/psychologist bi-monthly. N.R. had issues with muscle strength and was unable to hold a pencil, which affected his learning and education. N.R. went to OT and PT for fine motor skills and gross motor skills. According to

Foster Mother, N.R. struggled with self-regulation.

{¶ 29} Foster Mother testified that Mother had attended some of N.R.'s medical appointments and recently had attended more regularly. Father did not come to any of the medical appointments but attended an IEP meeting. Foster Mother testified that prior to November 2023, she informed Father of N.R.'s doctor appointments in advance via text message.

{¶ 30} Mother regularly visited with the children on Saturdays for four hours. According to Foster Mother, the visits went well. Mother showed up on time, fed the children, played with them, and brought them back. Although the transition for visitation between the foster parents and Mother was sometimes difficult for the children, there was no concern on Foster Mother's part. If Mother missed a visit, there would not be any negative behavioral concerns for N.R.

{¶ 31} Foster Mother testified that in the spring and summer of 2023, Father's visits with N.R. were off-site, and "things were fabulous." She and Father had open communication, and the visits almost always took place as scheduled. Typically, the exchanges occurred at the Warren County Career Center. Toward the end of July or August 2023, communication with Father started to fall off. Sometimes Foster Mother received a message that Father was unable to come or would be a little late, but other times she received no communication. In the fall of 2023, visitation shifted to the police department, and Father did not regularly attend those visits. Occasionally, Father would advise that he was unable to attend. When visits were missed, N.R. would scream, yell, kick, and cry until he was able to calm down and be redirected, which usually took about 30 to 60 minutes.

{¶ 32} At the time of the hearing, Father was visiting N.R. on Thursdays at the Visitation Center. N.R. always looked forward to seeing Father. In December 2023, Father

had two in-person visits with N.R. at the Visitation Center. In January 2024, Father had Zoom visits with N.R. every Thursday. In February 2024, they had one Zoom visit and one in-person visit. N.R. struggled sometimes with Zoom because he was easily distracted. After the visits, there would sometimes be difficulty getting N.R. to listen or follow directions because he was too excited and energetic. Foster Mother testified there was supposed to be a Zoom visit the night before the hearing, but there may have been a miscommunication. N.R. was dejected but easily redirected and played again within 30 minutes.

{¶ 33} Foster Mother described N.R. and N.S. as a "bonded pair" that "always look[ed] out for one another." The two recognized that they were siblings and loved one another. Foster Mother stated it was in the children's best interest for them to remain together if at all possible.

{¶ 34} Father testified on his own behalf. He stated that he had been informed by a mutual friend of Mother's that N.R. had died of SIDS when he was 26 or 27 months old. In October 2022, Father learned that N.R. was alive and immediately requested visitation. It took approximately one month before visits with N.R. started.

{¶ 35} Father testified that as part of his case plan, he provided MCCS with three years of pay stubs and completed a domestic violence class. He admitted he had had a domestic violence charge involving Mother in 2015. According to Father, he tried to get Mother to quit doing drugs and threatened to contact child protective services, but he ended up getting arrested. Father owned his own home and had a bedroom and bed for N.R. Father ran his own moving business, worked for a Christmas lighting company, did landscaping, and did remodeling and renovation work. Father testified he had sufficient income to meet N.R.'s needs. Father stated he attended N.R.'s basketball games and consistently visited N.R.

{¶ 36} Father explained that, in April 2023, a drunk driver totaled his truck. Because his truck was unavailable, Father took N.R. on a motorcycle ride on a private closed lane road. The motorcycle was not running at the time, and they were being pulled by another vehicle so that N.R. could get used to the motorcycle. A GoPro was used to video-record the experience. A few weeks later, Father transported N.R. back from visitation on the motorcycle, at which time he was told he could not transport N.R. on a motorcycle while N.R. remained in the custody of MCCS.

{¶ 37} Father explained that toward the end of summer 2023, he was struggling to make it to visitations because he was not permitted to use Uber, Lyft, a taxi, or other driving services, as no background check could be performed on the drivers. Father had his mother drive him to visits, but MCCS told him that this would not work because he could not have anyone with him when he was picking up N.R. Father's truck was not repaired until December 2023 or January 2024. Father testified that "nine weeks out of ten," he texted Foster Mother in advance to let her know if he would be able to pick up N.R., which depended on his transportation situation.

{¶ 38} After the visits were moved to the agency, most were conducted via Zoom. Father explained that N.R. had been upset about how little time they were getting to spend together at the Visitation Center, and N.R.'s behavior became assertive toward the end of the visits. N.R. did not want to leave and would kick the trash can or the chair. Father thought that doing Zoom visits might help N.R. Although Father could not recall the total number of visits he had had with N.R. since December 2023, he believed at least five of them were in-person visits.

{¶ 39} Father testified that he had been told the dates and times of doctor and therapist appointments. He was informed of N.R.'s autism spectrum test a week in advance,

but he was not able to get off work. He was also told about a couple of speech classes that were during the middle of a workday. Father was aware of N.R.'s medications and special needs and had attended N.R.'s IEP appointment. Father testified that if he received custody of N.R., his schedule was flexible enough to move his jobs to accommodate N.R.'s medical appointments. Father also had several family members nearby that were willing to help with N.R., such as babysitting or picking him up from school.

{¶ 40} Father was informed in July 2023 that MCCS would recommend he receive full custody of N.R. Father offered to adopt N.S. along with N.R. to keep the siblings together. If he could not also obtain custody of N.S., Father testified that he would do whatever was necessary to keep the siblings' relationship intact.

{¶ 41} Father's testimony addressed his comment about hurting anyone who would hurt his son. Father explained that when he picked N.R. up for a visit, N.R. had what appeared to be child-sized handprints on his arm. N.R. told Father that one of his foster sisters had squeezed his arm the day before, and it still hurt. N.R. stated that his foster sisters bullied him and, when he told his foster parents about it, Foster Father would smack the children in the back of their heads. This concerned Father because he surmised that if Foster Father was willing to hit his own children, then Foster Father would likely hit N.R. as well. Father reassured N.R. that he would stick up for him no matter what.

{¶ 42} Father added that Hamilton County Children Services had approved his home, he had submitted to random drug screens, and he had been granted visitation with his girlfriend's kids. Father indicated he was going to go to trial on the animal cruelty charge. Father opined that the case had been instigated by his neighbor, who repeatedly antagonized his dogs through the fence.

{¶ 43} The guardian ad litem ("GAL") testified last. Over the course of the custody

proceeding, the GAL conducted seven or eight virtual visits to Father's home. During the initial visit, Father's home was undergoing construction. But by the time Father's home visits with N.R. were set to begin, Father had cleaned up the construction work, and he had followed the GAL's instruction to obtain a bed for N.R. The GAL believed that Father's home was appropriate for N.R.

{¶ 44} The GAL monitored visits between Father and N.R. in Father's home and noticed that they had a great relationship. The GAL had no concerns about whether Father could handle N.R., only whether he could take N.R. to all his appointments. Father had indicated he would like custody of N.S. as well, and the GAL was going to recommend that legal custody of N.S. be given to Father too. However, between October and December or January preceding the custody hearing, Father and N.R. did not visit. Father contacted the GAL on several occasions indicating that MCCS was not letting him visit N.R. The GAL encouraged Father to maintain his involvement with virtual visits, and Father resumed visitation.

{¶ 45} The GAL observed that Father and the caseworker had a communication breakdown the last few months before the hearing. The GAL addressed Father's comments about hurting anyone who had hurt his child, explaining that he had not interpreted the comment the same way that the agency perceived it. It was clear to the GAL that Father was very upset with the caseworker.

{¶ 46} The GAL stated he was aware of the felony animal cruelty case and the involvement of Hamilton County Children Services with Father. The GAL testified that he had recommended that MCCS receive permanent custody of N.R. in his written report, because he was unsure of the issues involved in the Hamilton County Children Services case. The GAL later learned that Father was visiting his girlfriend's children in the home. At

the hearing, the GAL recommended that Father have legal custody of N.R. According to the GAL, Father and N.R. "deserve to be together." The GAL further recommended that if permanent custody of N.S. were granted to MCCS, then Father should attempt to adopt her too because N.S. and N.R. were closely bonded, and the GAL believed it would be detrimental to separate them.

{¶ 47} The GAL had concerns about Mother having custody due to her issues with housing and sobriety. Mother lived with her maternal grandmother in a home that was too small to accommodate the children. Before living with her maternal grandmother, Mother resided in a "sober living" residential facility for recovering addicts. Mother relapsed in July 2023 and had tested positive only for THC since then, but the GAL was unsure about Mother's sobriety when she was incarcerated during the pendency of the custody proceeding.

{¶ 48} The magistrate denied MCCS's motion for permanent custody, terminated MCCS's temporary custody, and granted Father's motion for legal custody. The magistrate found that R.C. 2151.414(B)(1)(d) was satisfied in that N.R. had been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period. However, the magistrate found that MCCS had not established that permanent custody was in the child's best interest by clear and convincing evidence. Rather, the magistrate found that it was in N.R.'s best interest for legal custody to be granted to Father. MCCS filed initial objections to the magistrate's decision and requested additional time to supplement its objections following receipt of the transcript. Mother likewise filed initial general objections to the magistrate's decision and requested additional time to supplement her objections. MCCS filed supplemental objections to the magistrate's decision, but Mother did not.

{¶ 49} The trial court overruled Mother's general objections and MCCS's initial and supplemental objections. The court found that although N.R. had been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period, N.R. could be placed with Father within a reasonable period of time, and MCCS had failed to establish by clear and convincing evidence that permanent custody by the agency was in the child's best interest. The trial court further found by a preponderance of the evidence that it was in the child's best interest for legal custody of N.R. be granted to Father. MCCS and Mother timely appealed. Their appeals were consolidated.

## II. Applicable Law

{¶ 50} MCCS raises the following two assignments of error challenging the trial court's grant of legal custody to Father and the denial of MCCS's motion for permanent custody:

The juvenile court abused its discretion in granting legal custody to Father.

The juvenile court erred in denying MCCS' [sic] motion for permanent custody.

{¶ 51} Mother raised the following two assignments of error in her appeal:

The Court did not err in denying the Agency's motion for permanent Custody of N.R.

The Court erred in granting Legal Custody of N.R. to [Father] instead of reunifying N.R. with Mother.

{¶ 52} MCCS and Mother argue that the trial court abused its discretion in granting legal custody of N.R. to Father because it was not in the child's best interest to do so. While MCCS argues that it was in the child's best interest for permanent custody to be granted to MCCS, Mother contends that it was in N.R.'s best interest to be returned to her custody.

### a. Mother's Appeal Is Reviewed for Plain Error

{¶ 53} Before addressing the merits of the case, we must first consider the effect of Mother's failure to file supplemental objections. MCCS points out that Mother timely filed initial general objections to the magistrate's decision but did not file supplemental objections with additional specificity. The trial court noted this in overruling Mother's objections, stating that Mother's objection failed to specify the grounds of her objection, and the court consequently overruled it.

{¶ 54} Juvenile Rule 40 governs a magistrate's decision in juvenile court proceedings. It provides that objections to a magistrate's decision "shall be specific and state with particularity all grounds for objection." Juv.R. 40(D)(3)(b)(ii). "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law . . . , unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Juv.R. 40(D)(3)(b)(iv). "Courts have held that general objections do not meet [the Juv.R. 40(D)] standard." (Citations omitted.) *Ramsey v. Ramsey*, 2014-Ohio-1227, ¶ 17 (7th Dist.). "A general objection, then, that alleges no particular error is effectively no objection at all." *In re N.M.*, 2015-Ohio-2180, ¶ 8 (2d Dist.).

{¶ 55} Therefore, we apply a plain error review to Mother's assignments of error. *Id.* "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error . . . seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. "Notice of plain error . . . is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of

justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

### b. Permanent Custody

{¶ 56} The right to raise one's own child is "an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). That right, however, is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). Severing the parent-child relationship in a permanent custody case "has been described as 'the family law equivalent of the death penalty in a criminal case.'" *In re Hayes* at 48, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). "The termination of parental rights should be an alternative of 'last resort.'" *In re D.A.*, 2007-Ohio-1105, ¶ 11, quoting *In re Cunningham* at 105. Though an award of legal custody is intended to be permanent, an award of legal custody is not equivalent to, or as drastic as, a permanent custody award, because legal custody "does not divest a parent of residual parental rights, privileges, and responsibilities." *In re C.R.*, 2006-Ohio-1191, ¶ 17; R.C. 2151.011(B)(21). Accordingly, termination of parental rights requires a higher burden of proof than a grant of legal custody.

{¶ 57} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court finds "by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *In re A.M.*, 2020-Ohio-5102, at ¶ 18. The parties do not challenge the trial court's finding that MCCS satisfied the requirement in R.C. 2151.414(B)(1)(d), which provides, in relevant part, that a court may grant permanent custody of the child to the

agency that filed the motion for permanent custody if the child had been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. Accordingly, the only issue under consideration before us is with the trial court's determination regarding the best interest of N.R.

{¶ 58} In order to conduct a best interest analysis in a permanent custody case, a trial court must consider the non-exhaustive list of factors in R.C. 2151.414(D)(1). These factors include, but are not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child. . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

*Id.* The statutory factors include whether any of the factors of R.C. 2151.414(E)(7) to (11) apply with respect to the parents and the child. R.C. 2151.414(D)(1)(e). None of the statutory elements of R.C. 2151.414(D)(1) are given any greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

{¶ 59} "An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest." *In re A.M.* at ¶ 19, citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "Clear and convincing evidence is that measure or degree of proof which is more than a mere

'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 60} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.* at ¶ 18. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), citing *State v. Robinson*, 162 Ohio St. 486 (1955). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when ' "the evidence is legally sufficient to support the [judgment] as a matter of law." '" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 61} "'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.'" *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Consequently, "'a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.'" *In re Adoption of L.B.R.* at ¶ 19, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 62} "When reviewing for manifest weight, the appellate court must weigh the

evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. "'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *In re Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." '" *Id.*, quoting *Seasons Coal* at 80, fn. 3, quoting 5 Ohio Jur.3d, Appellate Review, § 603, at 191-192 (1978).

### c. Legal Custody

{¶ 63} The juvenile court retains continuing jurisdiction over any child for whom the court has issued an order of disposition until certain specified events occur, such as the child reaching the age of 18 years or being adopted. *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Court of Common Pleas, Probate Div.*, 2016-Ohio-7382, ¶ 22, citing R.C. 2151.353(F)(1). "R.C. 2151.353(F)(1) and (2) and R.C. 2151.42(A) and (B) govern the modification or termination of dispositional orders involving abused, neglected, or dependent children." *In re I.E.*, 2020-Ohio-3477, ¶ 10 (2d Dist.). Relevant here, any party, other than a parent whose parental rights with respect to the children have been terminated, may file a motion with the court requesting a modification or termination of any dispositional order

imposed pursuant to R.C. 2151.353(A). In that circumstance, the court shall hold a hearing on the motion as if the hearing were the original dispositional hearing. R.C. 2151.353(F)(2). The dispositional orders authorized by R.C. 2151.353(A) include awarding legal custody to either parent or to a person who moves for legal custody prior to the dispositional hearing. R.C. 2151.353(A)(3). In this case, following the original dispositional hearing granting MCCS temporary custody of N.R. pursuant to R.C. 2151.353(A), Father filed a motion for legal custody.

{¶ 64} "A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child." *In re C.B.*, 2019-Ohio-890, ¶ 17 (2d Dist.), citing *In re M.O.*, 2015-Ohio-2430, ¶ 7 (2d Dist.). "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed. 1998). Accordingly, an abuse of discretion standard of review is applied to a trial court's judgment on a motion for legal custody. *In re L.H.* at ¶ 21, citing *In re J.T.*, 2017-Ohio-1303, ¶ 10-11 (2d Dist.). To find an abuse of discretion, we must conclude that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 65} A juvenile court's custody determination under R.C. 2151.353 must follow the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). *In re C.W.*, 2020-Ohio-6849, ¶ 6, quoting *In re D.S.*, 2014-Ohio-2444, ¶ 9. R.C. 3109.04(F)(1) provides the following non-exhaustive list of factors to consider: (a) the wishes of the child's parents; (b) the wishes and concerns of the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused or neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

### III. Best Interest Analysis

{¶ 66} MCCS argues that the juvenile court's denial of permanent custody of N.R. to the agency was not supported by sufficient evidence and against the manifest weight of the evidence. MCCS also claims that the trial court abused its discretion in granting Father legal custody because it was not in N.R.'s best interest. Although MCCS acknowledges the court considered the factors necessary to the determination of the custody of N.R., MCCS argues the trial court failed to address certain information within some of those factors.

{¶ 67} Mother argues that the trial court correctly denied MCCS's motion for permanent custody, but she contends that it was in N.R.'s best interest for him to be returned to her custody. Father responds that the trial court's decision denying MCCS's motion for permanent custody was not based on insufficient evidence or against the manifest weight of

the evidence. He asserts the trial court did not abuse its discretion in granting his motion for legal custody.

{¶ 68} We agree with Father. The trial court's judgment clearly reflects that it considered each factor in R.C. 2151.414(D)(1) and found that MCCS did not prove by clear and convincing evidence that it was in the best interest of N.R. to grant permanent custody to the agency. The trial court also properly considered each factor under R.C. 3109.04(F)(1) and concluded that it was in N.R.'s best interest for legal custody to go to Father.

### a. Permanent Custody – Applicable Factors

{¶ 69} The parties do not challenge the trial court's findings with regard to the child's wishes, R.C. 2151.414(D)(1)(b). Under this factor, the GAL's report noted that due to N.R.'s developmental delays, it was difficult to ascertain the child's wishes. The GAL noted that N.R. appeared comfortable with his foster parents and enjoyed visiting Mother and Father. Furthermore, the parties do not contest the trial court's recitation of N.R.'s historical custody under R.C. 2151.414(D)(1)(c).

{¶ 70} MCCS asserts the trial court failed to consider evidence related to N.R.'s interactions with others—R.C. 2151.414(D)(1)(a)—and N.R.'s need for a legally secure permanent placement and whether such placement could be achieved with a grant of permanent custody to the agency—R.C. 2151.414(D)(1)(d). MCCS adds that the court erroneously found that Father had not abandoned the child, as provided by R.C. 2151.414(E)(10).

{¶ 71} Mother and Father respectively agree with the trial court's conclusion that granting permanent custody of N.R. to MCCS was not in his best interest.

### i. Child's Interactions with Others – R.C. 2151.414(D)(1)(a)

{¶ 72} MCCS first complains that the trial court failed to consider N.R.'s relationship

with N.S., which caused the trial court's legal custody decision to be an abuse of discretion and its permanent custody determination to be against the manifest weight of the evidence and unsupported by sufficient evidence. Though the trial court did not discuss N.R.'s relationship with his half-sister, we cannot conclude that this caused the court's denial of the agency's motion for permanent custody to be unsupported by sufficient evidence or against the manifest weight of the evidence.

{¶ 73} N.R. was placed in a foster home in August 2021 and remained in that placement for the duration of the case. There was no dispute that N.R. was bonded with his half-sister. Evidence was presented that N.R. did well in the foster home and was bonded with the foster family; however, there was also testimony that N.R. had been bullied by his foster siblings and injured by one of them. While MCCS emphasizes N.R.'s bond of with his foster family, the foster family was not a foster-to-adopt placement, and there was no guarantee that N.R. and N.S. would be adopted together had MCCS been granted permanent custody of both children. MCCS also emphasizes that N.R. was very affected by changes to his routine, and a removal from his foster family could have adverse effects. But granting the agency permanent custody of N.R. would have resulted in his removal from the foster family at some point for him to be adopted. Furthermore, the caseworker acknowledged that since both children had special needs, it would be challenging for someone to adopt both children together.

{¶ 74} On the other hand, Father agreed that N.R. and N.S. should remain together and expressed his willingness to adopt N.S. He testified that even if he could not get custody of N.S., then he would do whatever he could to maintain the siblings' relationship. The GAL echoed this sentiment in recommending legal custody of N.R. be granted to Father and that, if permanent custody of N.S. were granted to the agency, then Father should go through the

adoption process with N.S. since Father was not her biological parent.

{¶ 75} MCCS also complains that the trial court failed to consider Father's visits with N.R. between July 2023 and December 2023. However, the trial court did consider Father's interactions with N.R. and their visitations, despite not explicitly referring to the time frame of July 2023 to December 2023.

{¶ 76} Father testified that he had been informed that N.R. had died from SIDS and only learned that N.R. was alive in October 2022. Father immediately requested visits with N.R. and was given a case plan. The caseworker testified that between October 2022 and October 2023, Father was compliant with the case plan, and the agency had no issues with him. In fact, MCCS filed a motion on July 27, 2023, requesting legal custody of N.R. go to Father. The motion stated that Father had successfully addressed his case plan objectives. It further stated that overnight visits between N.R. and Father began in July 2023 and there had been no reported concerns. Foster Mother testified that in the spring and summer of 2023, Father's visits with N.R. were off-site and "things were fabulous."

{¶ 77} It appears that sometime in September 2023 issues arose between Father and the caseworker to such an extent that on September 19, 2023, MCCS filed a motion requesting permanent custody of N.R. be given to the agency despite just two months earlier requesting legal custody be given to Father. According to the GAL, it was clear there was a communication breakdown between Father and the caseworker. It was also clear to the GAL that Father was very upset with the caseworker.

{¶ 78} The caseworker testified that, in September 2023, Father informed her that he would not attend visitations until he could obtain reliable transportation. Father testified that his truck had been involved in a crash and damaged in April 2023. After his truck was damaged, Father tried to get various forms of transportation to continue his visits with N.R.

However, over time, Father's attempts to continue visits with N.R. were thwarted by the agency's admonitions that he could not have his mother come with him for visits, he could not use Uber, Lyft, or a taxi, and he could not transport N.R. on his motorcycle. The GAL testified that Father complained of the agency's interference with his ability to visit with N.R., and GAL told Father to get involved in virtual visits if he was unable to attend in person. Father eventually attended virtual visits with N.R.

{¶ 79} Foster Mother testified that after the visits were moved to the police department, Father did not consistently attend. She testified that on occasion, Father would contact her to say that he would be unable to attend. Father testified that if he was unable to visit, the majority of the time, he told the Foster Parents that he could not attend. Nevertheless, once the visits were moved to the agency in December 2023, Father had missed one visit, attended three visits in person, and the rest of the visits were via Zoom.

### ii. Child's Need for Legally Secure Permanent Placement and Whether Such Placement Could Be Achieved Without a Grant of Permanent Custody to the Agency – R.C. 2151.414(D)(1)(d)

{¶ 80} Although none of the parties contest the trial court's finding that N.R. needed a legally secure permanent placement, the parties disagree about where that placement should have been. MCCS argues that it should have received permanent custody of N.R. to ensure his placement met his medical needs. Mother and Father separately argue that placement with one of them, respectively, was warranted.

{¶ 81} N.R. lived in a foster home during the pendency of the case, but the foster family was not willing to adopt. Although a grant of permanent custody to the agency would have provided a legally secure permanent placement, that type of placement was possible without granting permanent custody to the agency.

{¶ 82} The agency created case plans for Mother and Father to work toward reunification. The agency had ongoing concerns about Mother's sobriety and her inability to obtain stable independent housing. Although Mother had been engaged in substance abuse counseling services, she had difficulty maintaining sobriety throughout the custody proceedings. The initial basis of MCCS's involvement with the children was due to Mother's drug use. Mother had a relapse in July 2023 and tested positive for fentanyl. At the time of the hearing, Mother had zero days of sobriety and continued to test positive for marijuana.

{¶ 83} Mother also failed to obtain stable independent housing. Mother lived with maternal grandmother in a home that was too small for the children, and Mother was sleeping on the couch. Before living with maternal grandmother, Mother lived in sober living as part of her recovery. During the pendency of the case, Mother had been incarcerated. She had only recently obtained employment in January 2024.

{¶ 84} Father, on the other hand, had stable income and housing. Father owned his own home, lived alone, and had sufficient room for a child. The GAL testified that N.R. had his own bed and bedroom at Father's home. Father completed his domestic violence class, provided doctor verification for mental health medication, and had stable employment with sufficient funds to provide for N.R. By January 2024, Father had fixed his damaged vehicle and had working transportation to transport N.R. Despite the caseworker's contentions that Father and N.R.'s bond could have been better, testimony of Foster Mother, Father, and the GAL reflected that N.R. and Father had a good bond. Father was willing and able to provide N.R. with a legally secure permanent placement.

    iii. **Applicable Factors of R.C. 2151.414(E)(7) through (11) – R.C. 2151.414(D)(1)(e)**

{¶ 85} Mother and Father argue that the trial court did not err in concluding that none

of these factors apply. MCCS contends that the trial court should have discussed the "potential applicability of R.C. 2151.414(E)(10)," which considers whether "[t]he parent has abandoned the child."

{¶ 86} Under R.C. 2151.011(C), a child is presumed abandoned "when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." When MCCS filed its motion for permanent custody in July 2023, it listed the applicable statutory factors it believed warranted a grant of permanent custody to the agency. MCCS did not argue that R.C. 2151.414(E)(10) applied, nor did MCCS argue at the time of the hearing that Father had abandoned N.R. pursuant to this statute. Nevertheless, according to MCCS, the testimony of the caseworker demonstrated that Father did not visit with N.R. for three months. MCCS did not specifically identify any dates in order to calculate a period of 90 days during which Father did not visit with N.R. either in-person or virtually.

{¶ 87} The caseworker testified Father "had not visited from September to November" 2023. Tr. 16. Due to the Hamilton County Children Services case in November 2023, visitations were brought back to the agency and Father "had his first visit at the agency in December of 2023." *Id*. The caseworker added that Father had "gone a period of September to November and was not visiting with the child at all." *Id*. at 17. She did not identify when in September Father had last visited N.R. MCCS relies on the GAL's report that following the fall of 2023, Father visited N.R. again during the week of Christmas 2023. There was no testimony offered by any of the witnesses on this point.

{¶ 88} Nevertheless, there was testimony that if Father missed visits, then he asked for make-up visits and Foster Mother accommodated him. There was also testimony from Foster Mother that, after the visits changed to the police department, Father did not attend

regularly. But Foster Mother did not testify that Father failed to visit at all between certain specific dates. She also indicated that even during the time when Father was not regularly attending visits, he sometimes communicated with her about whether he would attend. Additionally, Foster Mother testified that in December 2023, Father had two in-person visits at the Visitation Center, but she did not identify the dates those visits occurred.

{¶ 89} MCCS also contends that "the record does not reflect any type of contact between Father and N.R. during the period in which Father stopped his visitations." The absence of evidence in the record that Father had any type of contact with N.R. between some unknown time in September and some unknown time in November or December is not the same as affirmatively demonstrating that Father did not maintain contact with N.R. during this timeframe. No witness was asked if Father maintained contact with N.R. during this timeframe such as through phone calls, emails, or letters.

{¶ 90} Neither the caseworker nor any other witness identified precisely when Father stopped visiting N.R. or when visits started again. Nor did any witness testify that Father failed to maintain any contact with N.R. during a 90-day period. Based on the lack of specific evidence of abandonment, it was not unreasonable for the trial court to conclude that this factor did not apply, as there was no definite 90-day time frame during which Father failed to visit or communicate with N.R.

### iv. The trial court did not err in overruling MCCS's motion for permanent custody.

{¶ 91} Despite MCCS's concerns that the trial court failed to consider certain aspects of the statutory permanent custody factors, the record contains sufficient evidence supporting the trial court's finding that permanent custody of N.R. to the agency was not in his best interest. Where there was conflicting evidence in the record, the credibility of the

witnesses and the weight of the evidence was ultimately up to the trier of fact, which was able to see and hear the witnesses. *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). A judgment is not against the manifest weight of the evidence simply because the trier of fact believed one side's testimony over the other's where there was conflicting evidence. *Peterson v. Booth*, 2023-Ohio-1301, ¶ 29 (2d Dist.), citing *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). In weighing all the factors, the trial court did not lose its way in concluding that the agency had failed to meet its burden of proving by clear and convincing evidence that permanent custody should be granted to the agency. Because the court's decision was not against the manifest weight of the evidence or unsupported by sufficient evidence, MCCS's second assignment of error is overruled.

### b. Legal Custody – Applicable Factors

{¶ 92} Neither MCCS nor Mother disputes the fact that no testimony was presented as to any of the legal custody factors in R.C. 3109.04(F)(1)(f) – (j). MCCS and Mother agree with the trial court's finding that, relevant to R.C. 3109.04(F)(1)(a), Father testified that he wished to have custody of N.R. The parties do not challenge the trial court's findings regarding the wishes of N.R.—R.C. 3109.04(F)(1)(b)—which were the same as the trial court's findings under R.C. 2151.414(D)(1)(b). Further, this court's analysis of N.R.'s interactions with others under R.C. 2151.414(D)(1)(a) similarly applies to R.C. 3109.04(F)(1)(c). The parties' disagreement is over the trial court's analysis of R.C. 3109.04(F)(1)(d) and (e)—N.R.'s adjustment to his home, school, and community, and the mental and physical health of all persons involved.

{¶ 93} Citing R.C. 3109.04(F)(1)(d), MCCS argues that although the trial court correctly stated that N.R. was doing well in his foster home and was bonded with his foster family, it should have given more weight to the evidence that N.R. was very affected by

changes in his routine and that N.R.'s removal from his foster home and separation from N.S. and his foster family could have had adverse effects. As we noted previously, N.R. was not in a foster-to-adopt home and could have difficulty being adopted due to his disabilities, and it would be particularly difficult for him to be adopted with N.S. By granting legal custody of N.R. to Father, N.R. would be provided a permanent placement, and Father testified he would continue to support N.R.'s relationship with N.S.

{¶ 94} MCCS further argues that, under R.C. 3109.04(F)(1)(e), it was paramount to N.R.'s well-being that his medical treatments continue without interruption. MCCS highlights the caseworker's and GAL's concerns with Father's ability to get N.R. to his medical appointments.

{¶ 95} There was no evidence presented that Father was unable to properly care for N.R.'s special needs, only that he had not attended N.R.'s doctors' appointments. Foster Mother testified that "when we were in open communication, prior to November [2023]," she provided Father advance notice of the medical appointments via text. According to Father, he was not advised of medical appointments, or he was given insufficient notice in order to attend. Nevertheless, at the time of the hearing, Father testified that he would have flexibility in his work to make N.R.'s medical appointments. Father was aware of N.R.'s medications and special needs and had attended N.R.'s IEP appointment. He further testified that he had reliable transportation available and several family members nearby who were willing to help with babysitting or transporting N.R. if he were given legal custody. The GAL testified he had no concerns about whether Father could handle N.R. In short, there was evidence in the record that Father could ensure that N.R.'s medical needs would be met.

{¶ 96} The record establishes that the trial court considered all the applicable statutory factors in determining the best interest of N.R. Based on the record before us, we

cannot conclude that the trial court's grant of legal custody to Father was an abuse of discretion. Accordingly, MCCS's first assignment of error is overruled.

{¶ 97} Because we conclude that granting legal custody to Father was not an abuse of discretion, and the trial court's decision was supported by sufficient evidence and not against the manifest weight of the evidence, no plain error is found. Therefore, Mother's assignments of error are also overruled.

## IV.    Conclusion

{¶ 98} Having overruled all the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.