[Cite as *In re Z.A.*, 2025-Ohio-5247.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

IN THE MATTER OF Z.A., A.A., Z.A.

: C.A. No. 2025-CA-39
:
: Trial Court Case Nos. 20230586;
: 20230587; 20230588
:
: (Appeal from Common Pleas Court-
: Juvenile Division)
:
: **FINAL JUDGMENT ENTRY &**
: **OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 21, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

CHRISTOPHER B. EPLEY, PRESIDING JUDGE

LEWIS, J., and HANSEMAN, J., concur.

HOLLY M. SIMPSON, Attorney for Appellant
ROBERT C. LOGSDON, Attorney for Appellee

EPLEY, P.J.

{¶ 1} Mother appeals from the judgment of the Clark County Common Pleas Court, Domestic Relations Division, Juvenile Section, granting permanent custody of three of her children, Z.A.1, Z.A.2, and A.A., to the Clark County Department of Job and Family Services ("JFS"), thereby terminating her parental rights. For the reasons that follow, the judgment of the trial court is affirmed.

## I.    Facts and Procedural History

{¶ 2} Z.A.1, Z.A.2, A.A., and two older siblings were born from the union of Mother and Father. Neither Father nor the two older siblings are parties to this appeal.

{¶ 3} JFS first became involved with the family in April 2023 after they were evicted from their home due to non-payment of rent and began staying in homeless shelters and hotels. In addition to the homelessness issue, it was reported that the family of eight—one of the older siblings had a child of her own—suffered from food insecurity, causing Mother and Father to often call around to ask for food.

{¶ 4} The agency was again contacted in June 2023 concerning Mother's and Father's alleged drug use. A case worker contacted Father at the Quality Inn in Springfield where they were staying, but he did not cooperate and would not allow the case worker to see the children. Father could not tell the case worker when the children had last visited a doctor, and Mother later confirmed that none of the children were immunized. They stated that although the children did not have a doctor in Springfield, they had went to Marysville

2

Pediatrics when they lived there. The parents refused to submit to a drug screen but admitted to smoking marijuana.

{¶ 5} A "family stability meeting" was held in July 2023. Both Mother and Father refused to submit to a drug screen and left the meeting before agency recommendations could be completed. Later that month, Z.A.1 had a health screening at the Rocking Horse Center and was diagnosed with a severe form of "lazy eye"; he was referred to Dayton Children's Hospital for treatment, but his parents never made an appointment.

{¶ 6} On September 15, 2023, the case worker received a call from the homeless shelter where the family was staying, the Executive Inn, due to concerns that Z.A.1, Z.A.2, and A.A. had been left unsupervised overnight, a violation of the shelter's rules. Law enforcement removed the children because Mother and Father could not be located. Due to the rules violation, the family was discharged from the shelter program, leaving them without a place to stay. As a result, JFS filed for ex parte custody, which was granted; Z.A.1, Z.A.2, A.A. and their siblings were placed with a relative. Shortly thereafter, the relative reported that she could no longer care for the children, and they were moved to foster care. On January 26, 2024, the children were placed in the temporary custody of JFS.

{¶ 7} To aid in reunification, a case plan was developed. It required Mother and Father to (1) have a drug and alcohol assessment and follow recommendations; (2) have a mental health assessment; (3) submit to random drug screens—with any refusal to be considered a positive; (4) obtain and maintain stable housing; (5) obtain and maintain employment and income sufficient to meet the needs of the children and provide paystubs for verification; (6) have consistent visitations with children at the visitation center; (7) maintain contact with the case worker and providers; and (8) sign releases for information

at the request of the case worker and providers. Mother refused to sign the plan, and it became an order of the court.

{¶ 8} Mother and Father failed to follow through with most of the case plan objectives, and on February 14, 2025, JFS filed a motion for permanent custody of Z.A.1, Z.A.2, and A.A. The motion stated that Mother and Father "have not been able to prove they are able to maintain safe, stable housing, [or] employment for financial means" and that the children were doing well in their foster placements.

{¶ 9} The permanent custody hearing was held on May 19, 2025. The trial court heard testimony from Ceasyn Bostick, the juvenile court treatment coordinator; Richard Hill, the family's case worker; and Leslie Buchanan, the guardian ad litem ("GAL"). A short time later, the court rendered its decision, granting permanent custody of Z.A.1, Z.A.2, and A.A. to JFS and terminating all parental rights and duties of Mother and Father as to the children.

{¶ 10} Mother has filed a timely appeal that raises three assignments of error.

II.     **Permanent Custody**

{¶ 11} In her first and second assignments of error, Mother makes related arguments that the trial court's decision granting permanent custody to JFS was against the manifest weight of the evidence and that the decision was not in the children's best interest. We disagree on both accounts.

{¶ 12} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Probate Div.*, 2016-Ohio-7382, ¶ 58 (O'Connor, C.J., dissenting).

4

{¶ 13} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives above to take permanent custody; or (d) has been in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.); R.C. 2151.414(B)(1).

{¶ 14} If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In re J.N.* at ¶ 26 (2d Dist.); R.C. 2151.414(B)(1). To help with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57.

5

{¶ 15} Because R.C. 2151.414 mandates that a juvenile court find by clear and convincing evidence that the statutory requirements are met, the sufficiency of the evidence and manifest weight standards of review are the proper standards of review, as applicable depending on the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 11; *In re Ca.S.*, 2021-Ohio-3874, ¶ 44 (4th Dist.) (a reviewing court will not disturb a trial court's permanent custody decision unless it is against the manifest weight of the evidence).

{¶ 16} When an appellate court reviews whether the lower court's permanent custody decision is against the manifest weight of the evidence, it "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." (Cleaned up.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶ 17} In resolving the first prong of the two-step R.C. 2151.414 analysis, the trial court found by clear and convincing evidence that Z.A.1, Z.A.2, and A.A. could not have been placed with Mother (or Father) within a reasonable period of time. The court reasoned that despite the efforts of the agency, "Mother has failed to meet any of her case plan objectives except for visiting with her children at the visitation center." Final Judgment, p. 11. Mother never had stable housing, routinely missed and then all together stopped drug screenings, almost always was unemployed, and went long periods of time with no contact with the case worker. Given Mother's failure to make even minimal progress with her case

6

plan in the previous year, there was little hope that anything would have changed to have allowed safe placement of the children back in her care in a reasonable period of time. The trial court's finding was not against the manifest weight of the evidence.

{¶ 18} Having found that the trial court did not err in its determination that Z.A.1, Z.A.2, and A.A. could not have been placed with Mother in a reasonable period of time as set forth in R.C. 2151.414(B)(1)(a), we move to the second step in the analysis—determining whether granting permanent custody to JFS was in the best interest of the children. The court focused on a few of the R.C. 2151.414(D)(1) factors.

Interaction and interrelationships of the children

{¶ 19} The court found that minimal evidence was presented at the hearing regarding the bond between Mother and the children. Mother did not testify, and the larger case record is sparse on the interactions between Mother and the children. It is noteworthy that although Mother was mostly compliant with visits, she was apparently unwilling to take the steps needed to move past on-site visits with the children. As the GAL wrote, "[Mother] has not shown that [she] is capable of meeting the children's needs. Since losing custody of the children, [she has] not made any changes that would positively impact upon [her] ability to parent these children." Permanent Custody Recommendation of Guardian Ad Litem, p. 5. Even if there was fondness shared between Mother and her children, and there almost certainly was, her interactions and choices did not reflect positively on her ability to parent.

{¶ 20} Besides the children's relationships with Mother, they had relationships with their foster caregivers. Evidence showed that Z.A.2 was bonded with her foster family. Z.A.1 was in a group home due to behavior concerns, but he was thriving there. A staff member with whom Z.A.1 had a great relationship was in the process of becoming a licensed foster

7

parent and was interested in fostering him. The needs of the children were being met in their placements. That was not the case when they had been living with Mother.

Wishes of the Children

{¶ 21} Though the children were not interviewed by the court, the GAL report filed on November 24, 2024, indicated that Z.A.1 (age 12 at the permanent custody hearing) did not wish to return to Mother if things had not changed for the better and that he expressed the desire to be placed in a foster home that could lead to adoption. Z.A.2 (age 10 at the hearing), while expressing that she sought to continue to see her siblings, stated that she wanted to remain with her foster family. A.A., who was only 7, was considered too young to truly understand the issue and its implications.

Custodial History

{¶ 22} The trial court also reviewed and considered the custodial history of Z.A.1, Z.A.2, and A.A. After removal from their parents in the fall of 2023, the children were never returned. They were initially together in a kinship placement, but that was short-lived, and the children were placed together in foster care. In the summer of 2024, Z.A.1 was removed from the home and placed in a group home after allegations were made that he was lying, stealing, and abusing animals. It was also alleged that he sexually abused another (unrelated) foster child in the home. Z.A.2 and A.A. were in a foster-to-adopt home and were happy. A.A. has played baseball. As the GAL reported, since being placed in foster care, the children's medical, dental, vision, educational, and mental health needs have been met for the first time.

Need for Legally Secure Placement

{¶ 23} While the Ohio Revised Code does not define a "legally secure permanent placement," Ohio courts have held that the phrase means "a safe, stable, consistent

8

environment where a child's needs will be met." *In re K.M.*, 2023-Ohio-3203, ¶ 35 (4th Dist.). The trial court found, and the evidence confirms, that Mother would have had a difficult time providing such an environment for her children. Even before JFS became involved with the family, they were living in hotels that acted as homeless shelters. Mother was not employed, was using marijuana on an almost daily basis, and was unable or unwilling to attend to the dental, medical, and educational needs of her children. Because of that, the case worker developed a plan to address Mother's shortcomings and facilitate the reunification of the family. Even knowing that improving in these areas would have led to reunification, Mother did not act. She refused to meet with the case worker, continued living in other people's homes, provided only one paystub in a year to show employment (for a store that went out of business), and tested positive for THC when she submitted to drug screens (there were months when she would not test).

{¶ 24} On the other hand, since the children have been under the care of the agency and in their foster placements, especially the current ones, their needs have been met. The children have had long-overdue dental work completed, they all have been enrolled in schools where they have the educational help they need, and Z.A.1 has had eye surgery to correct his "lazy eye." In addition, they were in stable living environments, not moving from hotel to hotel or shelter to shelter, and they were not being exposed to constant drug or alcohol abuse.

{¶ 25} The trial court's decision granting permanent custody to JFS was not against the manifest of the evidence, and we conclude, as the trial court did, that it was in the best interest of the children. Mother's first and second assignments of error are overruled.

9

### III. Additional Time

{¶ 26} In her third assignment of error, Mother contends that the trial court erred by not granting her additional time to complete the case plan.

{¶ 27} According to R.C. 2151.415(D)(1), an agency may request an extension of temporary custody for a period of up to six months, if, in its motion, it explains the progress on the case plan and the agency's expectations of reunifying the child with the family or placing the child in a permanent placement. If the motion is filed, the court must have a hearing to consider the evidence presented by the parties and GAL, and if it determines by clear and convincing evidence "that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension," it may grant the motion. R.C. 2151.415(D)(1).

{¶ 28} Mother's argument fails for two reasons. First, no one asked for an extension. Second, nothing in the record indicates that an additional six months would have changed anything. A year's worth of data strongly suggested Mother would not have complied with the case plan other than by visiting the children at the JFS visitation center.

{¶ 29} The trial court did not err by not preemptively granting a six-month extension, and therefore, Mother's third assignment of error is overruled.

### IV. Conclusion

{¶ 30} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HANSEMAN, J., and LEWIS, J., concur.

10