[Cite as *In re M.D.*, 2026-Ohio-1394.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

IN THE MATTER OF M.D., A.A.D.,
K.A.D.

: C.A. No. 2025-CA-64
:
: Trial Court Case Nos. 20180601,
: 20218602, 2018603
:
: (Appeal from Common Pleas Court-
: Juvenile Division)
:
: **FINAL JUDGMENT ENTRY &
OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 17, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

LEWIS, P.J., and TUCKER, J., concur.

KELLY M. SCHROEDER, Attorney for Appellant
JOHN M. LINTZ, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Mother appeals from the judgment of the Clark County Common Pleas Court, Domestic Relations Division, Juvenile Section, granting permanent custody of her minor children to the Clark County Department of Job and Family Services ("JFS"), thereby terminating her parental rights. Mother also appeals from the trial court's judgment denying her maternal aunt's motion for legal custody of the children. For the reasons outlined below, the judgment of the trial court is affirmed.

## Facts and Course of Proceedings

{¶ 2} Mother and Father are the biological parents of M.D. (age 12), A.A.D. (age 10), and K.A.D. (age 8) (collectively, "the children"). JFS initially became involved with Mother and Father due to M.D. and K.A.D. being born testing positive for drugs in their systems. Approximately a year after K.A.D. was born, JFS filed complaints on July 10, 2018, alleging that the children were dependent. Mother and Father stipulated to the dependency allegation, and on September 24, 2018, the trial court adjudicated the children dependent.

{¶ 3} After adjudicating the children dependent, the trial court granted a protective order of supervision that was scheduled to expire on July 10, 2019. A month prior to that expiration date, JFS filed a notice indicating that it was going to let the protective order expire and then close Mother and Father's case. As represented, JFS closed Mother and Father's case in 2019. Mother and Father were subsequently charged with multiple counts of child endangerment, so JFS reopened the case on February 15, 2023.

2

{¶ 4} The child endangerment charges arose after employees from Rent-A-Center delivered a generator to Mother and Father's home on February 8, 2023, and reported to the police that the children in the home were residing in deplorable living conditions. Upon conducting a welfare check, the police discovered that the home had no heat or electricity, no consumable food, an inoperable refrigerator infested with insects, a large amount of unclean dishes in the sink, dog feces on the floor, and an abundance of trash inside and outside the home. After observing these poor conditions, the police removed the children from Mother and Father's care.

{¶ 5} Following the children's removal, JFS placed the children with a kinship caregiver. The children remained with the kinship caregiver until May 2023. JFS obtained ex parte custody of the children on May 23, 2023, and then interim temporary custody on May 24, 2023, due to the kinship caregiver not keeping in contact with JFS and the caregiver advising JFS that she was no longer able to care for the children. JFS thereafter received temporary legal custody of the children on September 7, 2023.

{¶ 6} After obtaining custody of the children, JFS placed the children with a licensed foster family. During that time, JFS worked to assist Mother and Father in resolving the issues that had led to the children's removal. JFS developed a case plan with various objectives to help Mother and Father work toward reunifying with the children. Mother and Father did not cooperate with JFS and made only minimal progress on their case plans. Thus on July 15, 2024, JFS filed a motion for permanent custody of the children.

{¶ 7} Approximately one month after JFS filed for permanent custody, Mother's maternal aunt M.R. filed a motion to be added as a third-party intervenor and a motion for legal custody of the children. The trial court granted M.R.'s motion to be added as a third-party intervenor and scheduled the custody matter for an evidentiary hearing. The

evidentiary hearing was broken into eight separate dates between November 18, 2024, and May 6, 2025. Mother, M.R., the children's guardian ad litem ("GAL"), and the JFS caseworker assigned to Mother and Father's case attended all the hearing dates. Father was incarcerated, and he attended two of the hearing dates via the web conferencing platform Zoom. All parties, including Father, were represented by counsel during the hearings.

{¶ 8} The following is a summary of the relevant testimony that was elicited during the evidentiary hearings.

*Mother's Testimony*

{¶ 9} Mother is the biological mother of M.D., A.A.D., and K.A.D. She is also the biological mother of three older daughters who are half-siblings to the children. At the time of the evidentiary hearings, the three older daughters were 23, 18, and 17 years old. The 17-year-old daughter was legally emancipated and in the legal custody of her paternal grandmother. The other two daughters had also been in the legal custody of their paternal grandmother when they were minors. JFS was not involved in the custody matters pertaining to Mother's three older daughters.

{¶ 10} Mother admitted to being a drug addict and to using methamphetamine a few days before testifying at the custody hearing. Mother agreed that she was not fit and capable of caring for the children and expressed that it would be in the children's best interest for the trial court to grant M.R. legal custody. Mother did not see M.R. often, and she could not remember the last time the children were at M.R.'s house. Mother, however, claimed that M.R. had been involved with the children since their birth and that the children were bonded to M.R. Mother explained that she did not initially suggest M.R. as a placement option to

4

JFS because M.R. had been in Florida taking care of a sick friend. Mother also did not initially mention M.R. because she was hoping to reunify with the children.

*Foster Mother's Testimony*

{¶ 11} Foster Mother was married with five children. Foster Mother had three vehicles, including a 12-passenger van. Since receiving M.D., A.A.D., and K.A.D., Foster Mother quit her online teaching job to care for the children while her husband continued to work full time for the Ohio State Highway Patrol. Foster Mother and her husband refurbished their basement to create extra space for the children.

{¶ 12} When Foster Mother received the children, they all had behavioral concerns. M.D. was aggressive and would throw himself on the ground, scream, cry, and flail his hands when he did not get his way. A.A.D. yelled, lacked communication skills, and was very scared and anxious, as she was obsessed with small injuries like scuffs on her knee. K.A.D. cried constantly, was disobedient, and would not listen.

{¶ 13} While M.D. still had aggression issues when he was angry, Foster Mother reported that M.D.'s behavior had improved and that he geared his aggression towards his love of baseball. Foster Mother also reported that A.A.D.'s and K.A.D.'s behavior had improved. According to Foster Mother, A.A.D. was no longer overly preoccupied with her health and K.A.D. was no longer disobedient.

{¶ 14} Academically, the children were all on individual educational plans in the Springfield school district. Foster Mother reported that the children's academics had improved, but that they were still significantly behind. If adoption was possible, Foster Mother planned to home school the children as she did with her biological children.

{¶ 15} Foster Mother indicated that the children had multiple health concerns when she received them. K.A.D. was underweight and had poor vision that required reading

5

glasses. K.A.D. also had an infection in her mouth and had to have 16 decayed teeth pulled. M.D. was also underweight and had to have 12 teeth pulled and 8 fillings. Similarly, A.A.D. had to have 8 teeth pulled, 4 fillings, and 2 caps. A.A.D. also suffered from a lazy eye that required surgery. According to Foster Mother, basic hygiene was a new concept for the children.

{¶ 16} When initially placed in Foster Mother's care, none of the children asked questions about their parents. The children did not start talking about their parents until about six months after Foster Mother had received them. The children did, however, ask to see their older half-sisters. Foster Mother arranged visits with the sisters every two weeks, which had since turned into infrequent phone calls. The children did not talk about any other relatives with Foster Mother, but they had mentioned a man named Todd with whom they claimed they felt safe.

{¶ 17} Foster Mother placed all three children in counseling around September or October 2023. Foster Mother suspended counseling for a period of time because after a few months without visiting Mother and Father, the children were having no behavioral issues and were thriving. However, when the visits with Mother and Father resumed, their behavioral issues began to return. For example, M.D. started to have crying episodes, nightmares, and tantrums after visits with Mother and Father. As a result, Foster Mother placed the children back in counseling.

{¶ 18} Foster Mother was first made aware of M.R. in March 2024. Foster Mother recalled that the children were not familiar with M.R. According to Foster Mother, the children had their first visit with M.R. at the visitation center in July 2024. Starting November 5, 2024, the children had visits with M.R. every other week.

{¶ 19} Foster Mother had concerns about the children's visits with M.R. According to Foster Mother, the children came home from the visits upset because they wanted to visit their Mother instead. The children, especially K.A.D., often expressed that they did not want to visit M.R. The children reported to Foster Mother that M.R. had tried to bribe them with smartphones to live with her.

{¶ 20} Foster Mother did not think that M.R. was a safe placement option for the children. Foster Mother indicated that the children had also expressed their belief that M.R. was not a safe placement option. Foster Mother questioned M.R.'s mental health due to several public posts that M.R. had made on Facebook. For example, Foster Mother read a post by M.R. in which she referred to JFS as a terrorist group. She also claimed that M.R. wrote a post asking for advice on whether to use an experimental drug for her anxiety and depression, as well as a post disclosing that she is disabled and a recovered drug addict who suffers from executive functioning disorder.

{¶ 21} Foster Mother admitted that she had occasionally made disparaging comments about Mother and Father out of frustration when the children came home from visits with them. Foster Mother testified that she had also made the mistake of talking to her husband about her concerns with M.R.'s mental and physical health within earshot of the children. Foster Mother expressed remorse about making the disparaging comments and indicated that she did not want the children to have negative thoughts about their family. Foster Mother indicated that she had since tried to maintain better control over what she says when the children are around.

{¶ 22} Foster Mother explained that while the children love Mother and Father, they did not feel safe with them, and Foster Mother feared the children would be given back to them. Foster Mother expressed that she would like to adopt the children. She also testified

7

that if she were permitted to adopt the children, she would facilitate a continued relationship with the children's biological family as long as it is a healthy and safe option.

*JFS Caseworker's Testimony*

{¶ 23} The JFS caseworker testified that she was assigned to Mother and Father in March 2023. When the caseworker initially asked Mother for the names of anyone who could be a kinship caregiver for the children, Mother did not provide her with any names. At a subsequent court hearing, Mother recommended placing the children with two family friends—T.L. and A.W. The caseworker contacted T.L. and A.W., but T.L. indicated that he was unavailable and A.W. never followed through with the required background check and home study.

{¶ 24} The caseworker asked the children's older sisters if they knew of any family members who would be willing to care for the children, but the sisters could not provide the caseworker with any names. The caseworker also asked the eldest sister if she would be willing to be a placement option herself, and the sister indicated that she was unable to because of personal reasons.

{¶ 25} In spring 2023, Mother suggested that the children's maternal grandmother be a potential placement option. The caseworker attempted to contact maternal grandmother multiple times and went to her house, but the caseworker was unable to reach her. Father recommended his sister, but when the caseworker contacted the sister, she indicated that she was unable to care for the children. Having no other names, the caseworker ran an "AQUIRANT search" to find potential family members. The caseworker wrote 30 letters to potential family members obtained from the AQUIRANT search but received no positive responses.

{¶ 26} Mother did not mention M.R. as a possible placement option until March 2024. Mother did not know M.R.'s phone number, so the caseworker contacted M.R. via Facebook Messenger. The caseworker first reached out to M.R. in mid-March 2024. M.R. called the caseworker back on April 19, 2024, and confirmed that she was Mother's maternal aunt. M.R. told the caseworker that she needed to check with her husband about taking the children. After doing so, M.R. reached back out to the caseworker and indicated that she was willing to be a placement option. M.R. then began the background check and home study process, which was approved in August 2024.

{¶ 27} In July 2024, M.R. had her first visit with the children at the visitation center. The caseworker recalled that the children were nervous about the visit and that they did not remember M.R. Following the first visit, the caseworker indicated that the children were uncomfortable and expressed worries about continuing to visit M.R. The caseworker spoke with her supervisor, the GAL, and the children's counselor about the children's reaction to the visit. Following that discussion, the consensus was to discontinue the visits until an upcoming court hearing. At the court hearing, the trial court issued an order for the children to have visitation with M.R. Following that order, the children visited with M.R. every other Monday beginning in November 2024.

{¶ 28} According to the caseworker, M.R. canceled two visits with the children due to her husband having health issues. The caseworker indicated that M.R. has health issues herself. She testified that M.R. suffers from vertigo and multiple sclerosis ("MS"). The caseworker said that she had concerns about M.R. and her husband's health issues because the children were very active. The caseworker believed that the health issues of M.R. and her husband would make it difficult for them to meet the children's needs. The

9

caseworker also expressed concern that the children would regress in their behaviors and attitudes if they were removed from their foster home.

{¶ 29} The caseworker testified that the children cared deeply for Mother and Father, but that Mother and Father had continued to abuse drugs and failed to comply with their case plans. Mother's case plan objectives were to complete a drug and alcohol assessment, a mental health assessment, follow through with all recommendations from those assessments, obtain stable housing and income, and comply with JFS and court orders. Father's case plan objectives were the same, with the addition of completing an anger management course. The caseworker advised that Father had been in prison, but he had been recently released and had last visited the children in July 2024.

{¶ 30} The caseworker testified that Mother and Father were not capable of caring for the children. However, the caseworker testified that it would be appropriate for the children to maintain contact with Mother and Father if Mother and Father were safe and sober. The caseworker explained that the decision regarding the children's contact with Mother and Father would be made by the adoptive parents.

{¶ 31} The caseworker indicated that the children were bonded to their foster family and were very comfortable with them. The caseworker also indicated that the children were thriving in their foster family's care. The caseworker reported that M.D. had told her that if he could not reunify with Mother and Father, he wanted to stay with his foster family. The caseworker also reported that A.A.D. and K.A.D. both indicated that they wanted to stay with their foster family as opposed to reunifying with Mother and Father. The caseworker opined that it would be in the best interest of the children for JFS to obtain permanent custody.

*M.R.'s Testimony*

{¶ 32} M.R. was 57 years old and married. At the time of the custody hearings, M.R.'s

10

household included her husband and six grandchildren. The grandchildren were 21, 19, 17, 10, 8, and 5 years old. The 5-year-old grandchild is autistic.

{¶ 33} M.R. had lived on and off with her husband for 35 years. M.R. admitted that her husband had beaten her on more than one occasion years ago. M.R. indicated that since November 2024, her husband had experienced serious health issues that caused him to be bedridden for three months. M.R., however, reported that her husband's condition had since improved.

{¶ 34} M.R. raised two biological children and three stepchildren, who are now adults. In addition, M.R. raised six of her stepdaughter's children, as her stepdaughter is in prison. The six step-grandchildren were all adults, except for the 17-year-old who was living with M.R.

{¶ 35} M.R. claimed that before JFS became involved with M.D., A.A.D., and K.A.D., she visited the children five or six days a week. M.R. did, however, admit that some distance grew between her and the children when she stopped driving in 2021 or 2022. M.R. stopped driving due to her MS, as she felt that it was no longer safe for her to drive since she occasionally experienced "drop foot." Tr. 668. M.R. admitted that after she stopped driving, she did not have any face-to-face interaction with the children for two years. Despite this, M.R. asserted that she had always maintained a close relationship with the children.

{¶ 36} Although M.R. did not drive, she claimed that transporting the children would not be an issue because her husband and several other people in her household drove. M.R. explained that the children would get to school via a bus driver she knew. M.R. also claimed that the children's adult siblings would be able to drive them around.

{¶ 37} M.R. indicated that her MS caused her to suffer from short-term memory loss, which required her to use several calendars, journals, and Post-it notes to help her

11

remember things. Her grandchildren's school was aware of her condition and sent her multiple notices about school activities. M.R. also suffered from vertigo on a daily basis. According to M.R., the condition caused her to have constant numbness and tingling and a lack of coordination. M.R. also occasionally suffered from temporary blindness, blurry vision, slurred speech, and fatigue. In addition, M.R. reported having problems with her gait, which affected her mobility. M.R. also reported suffering from seasonal depression and a two-year opioid addiction, which started when she was diagnosed with MS in 2016. M.R. indicated that she was no longer addicted to opioids, but she testified to using marijuana to self-medicate.

{¶ 38} M.R. claimed that her medical issues would not impact her ability to provide for the children's daily needs. M.R., however, indicated that in 2017, she relinquished legal custody of a step-grandchild because her medical issues prevented her from caring for the child. Specifically, M.R. claimed that the child, who was 15 years old, was violent and that she was unable to protect herself. M.R. added that the 15-year-old child had a baby and that M.R. relinquished legal custody of that child as well because she could not keep up with a toddler.

{¶ 39} In 2018, M.R. was previously involved with JFS when she served as a chaperone for Mother and Father due to their substance abuse issues. During that time, M.R. moved in with Mother and Father and helped them with their daily routine. According to M.R., it did not take long for Mother and Father to close their case with JFS.

{¶ 40} M.R. learned about the children's removal from Mother and Father's care in 2023 while she was taking care of her sick friend in Florida. Approximately a year later in March 2024, M.R. received a Facebook message from the caseworker, who asked M.R. whether she would be able to take care of the children. This shocked M.R. because Mother

had led her to believe that she and Father had been completing their case plans and that they were on track to get the children back. However, M.R. learned from the caseworker that Mother had "done nothing on her case plan." Tr. 677. M.R. claimed that she did not know the children were living in deplorable conditions and that she did not realize how dire the situation was until she spoke with the caseworker.

{¶ 41} After discussing the situation with her husband and her adult children, M.R. contacted the caseworker and told her that she would be able to care for the children and that she was ready to move forward with the required background check and home study. M.R. passed both the background check and home study and later had visits with the children. M.R. described her visits with the children as "awkward" and "unnatural." Tr. 682. During one visit, M.R. recalled A.A.D. and K.A.D. walking her around the visitation center and making her aware of every camera and recording device. According to M.R., the children spent the entire time telling her that they were being watched. M.R., however, claimed that the children were more relaxed when they went outside to play. M.R. expressed her opinion that the children had been coached on how to act around her. M.R. claimed that her visits with the children were overall "really good" and that the children remembered her. Tr. 683.

{¶ 42} M.R. admitted that in September 2024, she made a Facebook post that vented her frustrations about JFS and referred to the agency as a "government-sanctioned trafficking ring." Tr. 753. M.R. claimed that it was an emotional response and that she regretted making the post. She also claimed that she would never vent her frustrations directly in front of the children. She denied bribing the children during her visits with them.

{¶ 43} Financially, M.R. indicated that she would provide for the children "as best as [she could]." Tr. 700. M.R. acknowledged having financial problems. She indicated that her husband was in physical therapy and retired but that he planned on returning to work. She

13

indicated that her husband had worked as a self-employed carpenter and that he received $1,200 per month in social security benefits. M.R. received $1,100 per month in disability benefits. M.R. said that she was working on opening up a small boutique in downtown Springfield because her disability benefits would not be enough financial support. M.R. had four bedrooms in her home plus three more that would have to be refinished before anyone could move into them.

{¶ 44} M.R. explained that she was asking for legal custody of the children because she loves them and because their family has a lot of heritage. She feared that if the children remained with their foster family, their older siblings would not be able to visit them anymore and that the children would lose their connection to their biological family. M.R. also claimed that she was bonded to the children, but she did not know if the children were bonded to her.

*GAL's Recommendation*

{¶ 45} The GAL recommended that the children be placed in the permanent custody of JFS due to Mother and Father not progressing on their case plans. The GAL expressed concerns that Mother and Father would never be able to provide a safe and stable home for the children. The GAL did not recommend the court grant legal custody to M.R. The GAL had several concerns with M.R.'s ability to care for the children. Specifically, he was concerned about M.R.'s health condition, Facebook posts, failure to intervene while knowing the children were not living in a safe environment, history of drug use, and current caregiving responsibilities to other children. The GAL also testified that he believed M.R. would allow Mother to see the children in violation of court orders. The GAL further noted that if legal custody were granted to M.R., the children would have to change school districts, which the GAL did not think was in the best interest of the children. However, the GAL did recommend

14

that the children continue to have visitation with their biological family, particularly their older half-siblings.

{¶ 46} Father did not provide any testimony during the evidentiary hearings he attended. Father's counsel advised the trial court that he wanted M.R. to have legal custody if he could not have custody of the children.

*Custody Decision*

{¶ 47} After considering the testimony and evidence presented at the evidentiary hearings, on August 6, 2025, the trial court issued a decision finding that it was in the children's best interest to grant JFS permanent custody. The trial court granted JFS's motion for permanent custody, thereby terminating Mother and Father's parental rights. The trial court further denied M.R.'s motion for legal custody. Mother now appeals from that judgment and raises two assignments of error for review.

**First Assignment of Error**

{¶ 48} Under her first assignment of error, Mother claims that the trial court's judgment granting JFS permanent custody should be reversed because Father was not properly served with notice of the evidentiary hearings. For the reasons outlined below, Mother's argument is not well taken.

{¶ 49} As a preliminary matter, we note that "[i]n permanent custody proceedings, when service of process upon a parent is defective, the juvenile court fails to acquire jurisdiction over that parent as required to terminate the parent's parental rights with respect to his or her children." *In re Holloway*, 1996 WL 227481, *2 (12th Dist. May 6, 1996); *State ex rel. Ballard v. O'Donnell*, 50 Ohio St.3d 182, 183 (1990) ("'It is axiomatic that . . . a judgment rendered without proper service or entry of appearance is a nullity and void.'"), quoting *Lincoln Tavern, Inc. v. Snader*, 165 Ohio St. 61, 64 (1956).

15

{¶ 50} "R.C. 2151.414(A)(1) provides, in relevant part, that when a motion for permanent custody is filed, 'the court shall schedule a hearing and give notice of the filing of the motion and of the hearing, in accordance with section 2151.29 of the Revised Code, to all parties to the action and to the child's guardian ad litem.'" *In re J.C.S.*, 2023-Ohio-1511, ¶ 53 (2d Dist.), quoting R.C. 2151.414(A)(1). "'For proper service [under R.C. 2151.29], the parents must be notified of the permanent custody motion and the initial permanent custody hearing by one of three methods: personal service, service by certified or registered mail . . . , or—if both those methods fail—by publication.'" (Bracketed text in original.) *Id.* at ¶ 54, quoting *In re Keith Lee P.*, 2004-Ohio-1976, ¶ 8 (6th Dist.), citing R.C. 2151.29 and Juv.R. 16.

{¶ 51} "Service by publication '"is reserved for those cases in which the residence of the parent is unknown and is not ascertainable with reasonable diligence."'" *Id.*, quoting *In re J.T.*, 2019-Ohio-465, ¶ 38 (4th Dist.), quoting *In re R.P.*, 2012-Ohio-4799, ¶ 18 (9th Dist.). "It has been described as '"a method of last resort."'" *Id.*, quoting *J.T.* at ¶ 38, quoting *In re Miller*, 33 Ohio App.3d 224, 226, (8th Dist. 1986). With regard to service by publication, Juv.R. 16(A) provides, in relevant part, that "[b]efore service by publication can be made, an affidavit of a party or party's counsel shall be filed with the court. The affidavit shall aver that service of summons cannot be made because the residence of the person is unknown to the affiant and cannot be ascertained with reasonable diligence and shall set forth the last known address of the party to be served."

{¶ 52} In this case, the record indicates that personal service was attempted at Father's residence on July 17, 2024, and that service could not be perfected due to Father's residence being boarded up and empty. On July 30, 2024, JFS filed a motion to serve Father by publication. The motion included an affidavit averring that Father's whereabouts were

16

unknown. Service by publication was thereafter effectuated between August 1, 2024, and August 8, 2024. Service on Father was never challenged or objected to during the court proceedings. Mother, however, is now challenging it for the first time in this appeal.

**{¶ 53}** Initially, we note that Mother complains of an alleged service error against Father, not herself. We recently addressed the same scenario in *In re A.W.*, 2025-Ohio-5657 (2d Dist.). The father in *A.W.* argued that the mother had not been properly served, and we stated the following in response:

> "'Generally, an appellant does not have standing to argue issues affecting another person.'" *Dayton Lodge, L.L.C. v. Hoffman*, 2013-Ohio-5755, ¶ 35 (2d Dist.), quoting *Benjamin v. Ernst & Young, L.L.P.,* 2006-Ohio-2739, ¶ 4 (10th Dist.). "'However, an appellant may "complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant."'" *Id.*, quoting *Benjamin* at ¶ 4, quoting *In re Smith*, 77 Ohio App.3d 1, 13 (6th Dist. 1991).
>
> This court has addressed a situation where a mother claimed that a children services agency did not complete a diligent search before serving notice of the permanent custody hearing on the father by publication. *In re Shackelford*, 1990 WL 68954, *5 (2d Dist. May 22, 1990). The mother argued that had the father received proper notice of the permanent custody hearing and attended the hearing, there may have been a chance that the father or one of his relatives would have received custody of the child, which would have allowed her to see the child more often. *Id.*
>
> The record in *Shackelford* indicated that the father had seen the child only three or four times before the child was removed from the mother's care,

17

had no contact with the children services agency, and had never made an effort to legally establish his paternity. *Id*. at *2-4. Under these circumstances, this court found that the possibility of the child being placed with the father or one of the father's relatives "was remote in the extreme." *Id*. at *6. The court also found that even if it were to assume that the children services agency could have made a greater effort to locate the father, the mother had failed to establish that she was prejudiced by the father being served by publication. *Id*. As a result, the court concluded that the mother lacked standing to argue that the father was improperly served with notice of the permanent custody hearing. *Id*.

Other appellate courts of this state have reached the same conclusion as *Shackelford* regarding standing. *See, e.g., In re Sours*, 1988 WL 81057, *2 (3d Dist. Sept. 27, 1988) (appellant mother lacked standing to object to a purported defect in service upon father where mother failed to point to any realistic possibility of prejudice to herself from the procedure followed by the juvenile court); *In re Jordan*, 2002 WL 121211, *7 (9th Dist. Jan. 30, 2002) (appellant mother lacked standing to raise alleged failure of service on father where mother failed to demonstrate that she was actually prejudiced by the alleged error); *In re Kincaid*, 2000 WL 1683456, *4 (4th Dist. Oct. 27, 2000); (appellant mother had no standing to raise the issue of the trial court's personal jurisdiction over the father when there is no evidence that her defense was prejudiced by the absence of the father from the proceedings).

*A.W.*, 2025-Ohio-5657, at ¶ 74-77 (2d Dist.).

{¶ 54} Based on the foregoing case law, this court found in *A.W.* that the father lacked standing to challenge the service on mother because he had failed to argue how he was prejudiced by the alleged service error and because the record did not otherwise establish any resulting prejudice. *Id*. at ¶ 78. Significantly, the record in *A.W.* indicated that the mother was aware of the hearing date and simply chose not to attend. *Id*.

{¶ 55} The present case is similar to *A.W.* Here, Mother does not argue how she was prejudiced by the alleged service error on Father. The record indicates that Father was aware of the custody matter, was represented by counsel at all of the hearing dates, and remotely attended two of the hearing dates himself. Father chose not to testify, and his counsel expressed Father's wishes to have the children placed in the legal custody of M.R. Under these circumstances, we fail to see how the alleged service error on Father could have prejudiced Mother or even Father for that matter. Because Mother has failed to make any argument regarding how she was prejudiced by the alleged service error and because the record does not otherwise establish any prejudice, Mother lacks standing to raise the alleged service error in this appeal.

{¶ 56} Mother's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 57} Under her second assignment of error, Mother claims that the trial court's judgment granting permanent custody to JFS should be reversed because M.R. was a suitable relative who was ready, willing, and able to take legal custody of the children. According to Mother, the children's best interest would have been served by granting M.R. legal custody. Mother, therefore, is essentially challenging the trial court's denial of M.R.'s motion for legal custody. Alternatively, Mother argues that the trial court should have granted

an extension of temporary custody as opposed to awarding JFS permanent custody. For the reasons outlined below, Mother's arguments are not well taken.

*Legal Custody*

{¶ 58} "If a child is adjudicated a 'dependent child,' the court may grant legal custody of the child 'to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child.'" *In re D.P.*, 2024-Ohio-480, ¶ 11 (2d Dist.), quoting R.C. 2151.353(A)(3). "An award of legal custody gives the custodian the right to have physical care and control of the child, to determine where the child lives, 'and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.'" *Id.*, quoting R.C. 2151.011(B)(21). "A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child." *In re C.B.*, 2019-Ohio-890, ¶ 17 (2d Dist.), citing *In re M.O.*, 2015-Ohio-2430, ¶ 7 (2d Dist.).

{¶ 59} "The custody determination under R.C. 2151.353 must be made in accordance with the 'best interest of the child' standard described in R.C. 3109.04(F)(1)." *D.P.* at ¶ 12. "The factors which must be considered include things like the 'parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and other who may significantly affect the child's best interest; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons.'" *Id.*, quoting R.C. 3109.04(F)(1). (Other citation omitted.).

{¶ 60} This court applies an abuse of discretion standard of review to a trial court's judgment on a motion for legal custody and will not reverse it absent an abuse of that discretion. *In re G.D.*, 2023-Ohio-1913, ¶ 10 (2d Dist.). "'Abuse of discretion' has been

20

defined as an attitude that is unreasonable, arbitrary, or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable." *Id*. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*.

*Standing to Challenge Denial of Motion for Legal Custody*

{¶ 61} "'A parent has no standing to assert that the court abused its discretion by failing to give the [third-party relative] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper.'" *In re L.W.*, 2017-Ohio-657, ¶ 23 (8th Dist.), quoting *In re S.G.*, 2016-Ohio-8403, ¶ 52 (3d Dist.), citing *In re Pittman*, 2002-Ohio-2208, ¶ 70 (9th Dist.). Therefore, "a parent who does not challenge the termination of her or his own parental rights may not instead assert the rights of a relative who has not appealed the denial of her or his petition for legal custody." *In re K.C.*, 2017-Ohio-8383, ¶ 8 (1st Dist.); *see In re S.F.*, 2020-Ohio-693, ¶ 51 (2d Dist.) (contrasting a scenario where a parent appeals from the parent's own motion asking for a relative to be granted legal custody). In other words, a parent may appeal the termination of only his or her own parental rights, not the denial of a motion by a third party.

{¶ 62} In this case, M.R. is not a party to this appeal, yet Mother is challenging the trial court's denial of M.R.'s motion for legal custody. Without M.R. appealing from the trial court's denial of her motion for legal custody, there is no remedy we can provide, as we cannot assume that M.R. still desires to be awarded legal custody of the children. Stated simply, Mother does not have standing to argue for legal custody in favor of M.R. Her challenge on appeal is limited to whether the trial court's decision to terminate her parental rights was proper.

**{¶ 63}** Even if Mother had standing to challenge the denial of M.R.'s legal custody motion, we would not find that the trial court abused its discretion by denying it. Indeed, it was reasonable for the trial court to deny the motion given M.R.'s serious health concerns, her responsibilities to several other children in her household, her negative social media posts about JFS, her finances, her past history with drug addiction and domestic violence, and her lack of any bond with the children.

*Permanent Custody*

**{¶ 64}** Because Mother alternatively argued that the trial court should have extended JFS's temporary custody, as opposed to awarding it permanent custody, we also review the trial court's permanent custody decision.

**{¶ 65}** Initially, we note that "[i]t is well recognized that the right to raise one's own child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). That right, however, is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). "Severing the parent-child relationship in a permanent custody case 'has been described as "the family law equivalent of the death penalty in a criminal case."'" *In re N.R.*, 2025-Ohio-2896, ¶ 56 (2d Dist.), quoting *Hayes* at 48, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). "The termination of parental rights should be an alternative of 'last resort.'" *In re D.A.*, 2007-Ohio-1105, ¶ 11, quoting *Cunningham* at 105. "Though an award of legal custody is intended to be permanent, an award of legal custody is not equivalent to, or as drastic as, a permanent custody award, because legal custody 'does not divest a parent of residual parental rights, privileges, and responsibilities.'" *N.R.* at ¶ 56, quoting *In re C.R.*, 2006-Ohio-1191, ¶ 17; *see*

22

R.C. 2151.011(B)(21) (defining "legal custody"). "Accordingly, termination of parental rights requires a higher burden of proof than a grant of legal custody." *Id*.

{¶ 66} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court finds "by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest." *In re A.M.*, 2020-Ohio-5102, ¶ 18, citing R.C. 2151.414(B)(1).

{¶ 67} With regard to the factors under (a) through (d) of R.C. 2151.414(B)(1), "the court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period." (Citations omitted.) *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.). Under R.C. 2151.414(B)(1)(e), the court must find that "[t]he child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state." R.C. 2151.414(B)(1)(e). "If any of the aforementioned factors are satisfied, then the court must determine whether granting permanent custody is in the best interest of the child." *In re A.W.*, 2025-Ohio-5657, ¶ 51 (2d Dist.), citing *J.N.* at ¶ 26 and R.C. 2151.414(B)(1).

{¶ 68} When making the best-interest determination, R.C. 2151.414(D)(1) provides the following non-exhaustive list of factors for the trial court to consider:

(a)     The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home

23

providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶ 69} "[A] court must consider 'all relevant factors,' including five enumerated statutory factors . . . . No one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57, quoting *In re Schaefer*, 2006-Ohio-5513, ¶ 56. "Juvenile courts need not 'expressly discuss each of the best-interest factors,' and '[c]onsideration is all the statute requires.'" (Bracketed text in original.) *In re H.V.F.*, 2024-Ohio-5838, ¶ 41 (2d Dist.), quoting *A.M.*, 2020-Ohio-5102, at ¶ 31.

{¶ 70} The standards that apply in reviewing decisions on the permanent custody of children and the termination of parental rights are sufficiency of the evidence and manifest weight of the evidence. *In re Z.C.*, 2023-Ohio-4703, ¶ 1. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id*. at ¶ 14, citing *Eastley v.*

24

*Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

{¶ 71} In contrast, a review for the sufficiency of the evidence involves testing the adequacy of the evidence and determining, as a matter of law, whether the evidence is legally sufficient to sustain a judgment. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when '"the evidence is legally sufficient to support the [judgment] as a matter of law."'" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 72} As to the first finding required for JFS to receive permanent custody, the trial court found under R.C. 2151.414(B)(1)(a) that the children could not be safely placed with Mother or Father within a reasonable period of time. This finding is supported by sufficient evidence and is not against the manifest weight of the evidence. The record indicates that at the time of the hearing, Mother and Father had a longstanding history of substance abuse and that they had failed to make any progress on their case plan objectives for over a year, despite receiving assistance from JFS. The record also includes the GAL's reported concern that Mother and Father would never be able to provide a safe and stable home for the children. Additionally, Mother testified that she was a drug addict and not capable of caring for the children.

{¶ 73} The trial court also found under R.C. 2151.414(B)(1)(b) that Father had abandoned the children. That finding is also supported by sufficient evidence and is not against the manifest weight of the evidence. A child is presumed abandoned when a parent has failed to visit or maintain contact with the child for more than 90 days. R.C. 2151.011(C). Here, the record indicates that Father had not contacted the children since July 2024, which

25

was well over 90 days prior to the commencement of the permanent custody hearing in November 2024.

{¶ 74} As for the best-interest finding, the trial court considered the relevant factors under R.C. 2151.414(D)(1) and determined that permanent custody in favor of JFS was in the children's best interest. In reviewing that decision, we consider each of the applicable factors.

a. Children's Interactions and Interrelationships with Others

{¶ 75} The record establishes that the children were very bonded to their foster family and to each other. While the children were also very bonded to their adult half-siblings and Mother, those parties expressed that they were unable to care for the children. The foster family provided a safe, stable, and loving home for the children and wished to adopt the children. Foster Mother permitted the children's half-siblings to visit the children, and she indicated that if she were to adopt the children, she would continue to allow the children to visit their half-siblings. While some of the half-siblings expressed that they were uncomfortable around Foster Mother due to her religious beliefs, nothing in the record indicates that Foster Mother ever prohibited the half-siblings from having contact with the children. The record indicates that it was the half-siblings' choice to stop communicating regularly with Foster Mother and the children. Foster Mother also indicated that she would allow Mother and Father to have contact with the children as long as it was a safe and healthy option.

b. Children's Wishes

{¶ 76} The record establishes that the children were interviewed in camera individually and that they each expressed a desire to be safe and to remain with their foster family.

26

c.   Custodial History

{¶ 77} The record establishes that the children have had a longstanding history with JFS. In 2018, the children were adjudicated dependent and placed under an order of supervision due to Mother's and Father's drug abuse issues. Thereafter, in February 2023, the children were removed from Mother and Father's care due to deplorable living conditions, and the children were once again adjudicated dependent. The children were initially placed with a kinship caregiver, but JFS eventually received temporary custody of the children in May 2023 and placed them with their foster family. The children have lived with their foster family ever since.

d.   Children's Need for Legally Secure Placement

{¶ 78} "While the Ohio Revised Code does not define a 'legally secure permanent placement,' Ohio courts have held that the phrase means 'a safe, stable, consistent environment where a child's needs will be met.'" *In re Z.A.,* 2025-Ohio-5247, ¶ 23 (2d Dist.), quoting *In re K.M.*, 2023-Ohio-3203, ¶ 35 (4th Dist.).

{¶ 79} The record indicates that Mother and Father failed to rectify the issues that caused the children to be removed from their care despite JFS's reasonable efforts to assist them. Specifically, Mother and Father continued to use drugs, did not gain meaningful employment, and did not obtain appropriate housing. It was not viable to return the children to Mother or Father. Mother herself admitted that she was not capable of caring for the children. Also, the GAL expressed doubts as to whether Mother and Father would ever be able to provide a safe and stable home for the children.

{¶ 80} The record indicates that the children's eldest half-sibling told JFS that she was unable to care for the children, as she was young with personal issues of her own. The record also indicates that M.R. was not a viable placement option because she had severe

27

health concerns, was responsible for several other children, posted negative comments about JFS on social media, had financial issues, had a past history of addiction and domestic violence, and acknowledged that the children were not bonded to her.

{¶ 81} Despite much effort, JFS could not find an appropriate relative who was willing and capable of caring for the children. Accordingly, the record supports finding that the children were in need of a legally secure placement that could not have been achieved without granting permanent custody to JFS.

{¶ 82} When considering all the aforementioned factors, we find that sufficient evidence supports the trial court's determination that it was in the children's best interest to grant JFS permanent custody. We also find that the trial court's best-interest determination is not against the manifest weight of the evidence. Therefore, we cannot say that the trial court erred by granting JFS's motion for permanent custody and terminating the parental rights of Mother and Father. Accordingly, Mother's alternative argument that the trial court should have instead extended temporary custody to JFS is not well taken.

{¶ 83} Mother's second assignment of error is overruled.

### Conclusion

{¶ 84} Having overruled both assignments of error raised by Mother, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, P.J., and TUCKER, J., concur.

28